**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable Marcia S. Krieger**

Civil Action No. 11-cv-02343-MSK-MEH

**CHERYL ARABALO,**

     **Plaintiff,**

**v.**

**CITY OF DENVER, COUNTY OF DENVER, through its elected officials, the Denver City Council;
ASHLEY KILROY, in her official capacity as Acting Safety Manager for the City and County of Denver;
CAPTAIN GUTIERREZ, and
PHILLIP DEEDS,**

     **Defendants.**

---

**OPINION AND ORDER ADOPTING RECOMMENDATION, GRANTING MOTION TO DISMISS, AND GRANTING IN PART MOTION FOR SUMMARY JUDGMENT**

---

**THIS MATTER** comes before the Court pursuant to Ms. Arabalo's Objections (**# 129**) to the Magistrate Judge's March 1, 2013 Recommendation (**# 127**) that Defendant Captain Gutierrez's Motion to Dismiss (**# 112**) be granted, and Mr. Gutierrez's response (**# 131**); and Defendants City and County of Denver ("Denver"), Ms. Kilroy, and Mr. Deeds' Motion for Summary Judgment (**# 128**), Ms. Arabalo's response (**# 130**), and the moving Defendants' reply (**# 132**).

## FACTS

The Court will summarize the pertinent facts here and elaborate as necessary in its analysis.

According to Ms. Arabalo's Third Amended Complaint **(# 109)**,[1] Ms. Arabalo was a longtime employee of the Denver Sheriff's Department (the "Department"), overseeing inmates at the Denver County Jail.  In addition, she volunteered her time to work with the Denver Sheriff's Foundation ("the Foundation"), a non-profit organization dedicated to providing financial assistance to needy Department employees and family members.

In December 2008, after a televised news report about salacious conduct by a different public official who also had the name "Arabalo," Ms. Arabalo began receiving sexually-tinged comments and catcalls from inmates under her supervision.  She used her power as a corrections officer to discipline some of those inmates that she could specifically identify as engaging in harassment, but was apparently unable to quash the behavior in its entirety.  She raised complaints about the inmates' conduct to her superiors, but was instructed that it was "her job" to endure the conduct, and no additional action was taken by the Department against the inmates.  Ms. Arabalo sought to escape the conduct by seeking transfers to other open positions in the Department, but her requests for transfers were denied for a period of nearly six months.  Eventually, she was able to secure a transfer to a different job within the Department.

In October 2009, Ms. Arabalo was involved in an incident with two Sheriff's Deputies at her home.  (The Third Amended Complaint does not specifically state, but the Court understands that the incident occurred while all parties were off-duty.)  She believes that the two Deputies drugged her into unconsciousness and proceeded to rape her.  She reported the incident to Ms. Deeds, her immediate supervisor, but Mr. Deeds told her that the matter was a "he said, she said"

---

[1]     As will become clear in the Analysis, some of the allegations in the Third Amended Complaint take on a different gloss from (or are simply contradicted by) evidence submitted in the record for purposes of the summary judgment motion.  Nevertheless, the instant recitation of facts will focus solely on the facts as alleged in the pleadings.

scenario and that all parties involved in the incident should "keep it under wraps."  Mr. Deeds did not inform his superiors of Ms. Arabalo's complaint or investigate the matter further.

Ms. Arabalo also states that "throughout her employment," Mr. Guiterrez "made sexual comments and gestures" towards her, but that this conduct became "more frequent and vulgar" after Ms. Arabalo reported the rape incident.  She states that "on one or more occasions," Mr. Gutierrez "requested that [she] shut the door, sit on his lap, come around his desk and unbutton her blouse."  She also recounts particular incidents on August 26, 2010, in which Mr. Gutierrez "asked [her] to lift up her shirt and motioned for her to sit on his lap . . . and he would give her a 'big surprise,'" and on August 27, 2010, in which Mr. Gutierrez, in front of other employees, "greeted [her] by asking what she was wearing."  These events occurred at a time when Mr. Gutierrez has been designated to act as Ms. Arabalo's immediate supervisor.  Ms. Arabalo states that Mr. Gutierrez had previously been counseled by his own supervisor for being "[un]professional" in his behavior towards subordinates, but that the Department had not meted out any discipline to him for such behavior.

Ms. Arabalo contends that she was retaliated against for having complained of discrimination and harassment.  She contends that she initially filed a charge of discrimination with the Colorado Civil Rights Division ("CCRD") in April 2010, and in May 2010, she "became the subject of an internal investigation regarding a bake sale and a vacation."  In June 2010, she filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), and in or about late July 2010, she was "informed she was being investigated for an alleged false report."  The latter investigation ultimately resulted in Ms. Arabalo being charged

with "lying and altering paperwork," for which she received a 70-day suspension (which she characterizes as "the longest suspension in the history of the Department").

In the meantime, during an internal investigation into Ms. Arabalo's complaints of discrimination and harassment against Mr. Gutierrez, Mr. Gutierrez (falsely, according to Ms. Arabalo) informed investigators that Ms. Arabalo had misappropriated funds from the Foundation.  That allegation was referred to the Denver Police Department, who convened a Grand Jury to consider the matter, but the Grand Jury refused to return an indictment.

In May 2011, when Ms. Arabalo returned to the Department at the conclusion of her suspension, she was immediately placed on "investigatory leave," although the Third Amended Complaint does not describe the nominal basis for the investigation.  It merely states that her employment with the Department was terminated by Ms. Kilroy on March 16, 2012.

Based on these allegations, Ms. Arabalo alleges eight causes of action: (i) hostile environment sexual harassment, pursuant to Title VII, 42 U.S.C. § 2000e *et seq.*, against Denver; (ii) retaliation, in violation of Title VII, against Denver; (iii) a claim pursuant to 42 U.S.C. § 1983 against Mr. Deeds, in both his official and individual capacities, in that he "deprived [her] of her right to equal protection" (apparently on the basis of her sex), "by failing to take proper action" in response to her complaint of having been raped by the two Deputies; (iv) a § 1983 claim under *Monell* against Denver and Ms. Kilroy (in her official capacity), in that these Defendants failed to train and supervise Department employees and adopt appropriate policies to prevent the deprivation of Ms. Arabalo's constitutional right to equal protection; (v) a § 1983 claim against Mr. Gutierrez (in his individual and official capacities), in that his sexually-harassing conduct deprived Ms. Arabalo of equal protection; (vi) a common-law claim for

4

defamation against Mr. Gutierrez, based on his accusations that she had embezzled funds from the Foundation; (vii) a common-law claim for outrageous conduct against Mr. Gutierrez (in his individual capacity), based on his "publishing defamatory statements against [her]"; and (viii) a common-law claim for "breach of implied employment contract" against Denver, in that its employee handbook and other policies constituted a contract promising to investigate discrimination and impose fair discipline, and that it breached that contract with her.

Mr. Gutierrez moved (**# 112**) to dismiss the claims against him in the Third Amended Complaint, arguing: (i) that the § 1983 claim against him should be dismissed, because Ms. Arabalo "presents no allegations that she was treated differently from others similarly situated," because she "presented no allegations even arguably rising to the level of the egregious conduct necessary to warrant Equal Protection relief," and because any constitutional violation she sufficiently alleges was not "clearly established" at the time, entitling Mr. Gutierrez to qualified immunity; (ii) that the common-law claims against him are barred by the Colorado Governmental Immunity Act ("CGIA"), C.R.S. § 24-10-118(2)(a), in that she failed to file a timely Notice of Claim as required and makes only conclusory allegations that Mr. Gutierrez's conduct was willful and wanton; and (iii) that her defamation and outrageous conduct claims fail to state a claim and/or are untimely.

The Court referred Mr. Gutierrez's motion to the Magistrate Judge for a recommendation. On March 1, 2013, the Magistrate Judge recommended (**# 127**) that Mr. Gutierrez's motion be granted.  In particular, the Magistrate Judge found: (i) that the common-law claims "arise out of an act or omission" by Mr. Gutierrez "during the performance of his duties" – namely, giving a statement to the Department's Internal Affairs Bureau during an investigation into workplace

conduct – and thus, were barred by Ms. Arabalo's undisputed failure to file a timely Notice of Claim; (ii) that Ms. Arabalo's allegations of sexual harassment by Mr. Gutierrez fail to state a §1983 equal protection claim because Mr. Gutierrez only exercised supervisory authority over her for a two-day period (August 26-27, 2010), and that his conduct during that period constitutes merely "boorish" or "juvenile" behavior insufficient to amount to an equal protection violation; and (iii) leave to amend should be denied, insofar as Ms. Arabalo has already conducted significant discovery and has been granted leave to amend her pleading on several previous occasions.  Ms. Arabalo filed timely Objections **(# 129)** to the Recommendation, challenging the Magistrate Judge's findings with regard to the substantive claims (but not challenging the recommendation that leave to amend be denied).

Separately, the remaining Defendants – Denver, Mr. Deeds, and Ms. Kilroy – moved for summary judgment **(# 128)** on Ms. Arabalo's claims against them and on their affirmative defenses, raising arguments the Court addresses in detail below.

## <u>ANALYSIS</u>

### A.  Motion to dismiss and Recommendation

The Court conducts a *de novo* review of the objected-to portions of the Recommendation. Fed. R. Civ. P. 72(b).  Because Ms. Arabalo objects to all of the substantive findings by the Magistrate Judge, the Court essentially considers the motion to dismiss anew.

In doing so, the Court notes that Mr. Gutierrez's attack on the common-law claims contests the Court's subject-matter jurisdiction over those claims.  *See generally Maestas v. Lujan*, 351 F.3d 1001, 1014 (10th Cir. 2003); C.R.S. § 24-101-118(1)(a) (failure to comply with CGIA's requirements "shall be a jurisdictional prerequisite to any such action").  This type of

challenge to the Court's subject-matter jurisdiction relies on matters outside the four corners of the Third Amended Complaint (*e.g.* the absence of a Notice of Claim), and thus, the Court does not necessarily presume the truthfulness of the allegations in the complaint, and the Court has broad discretion to receive supporting evidence or or affidavits, and, if necessary, conduct a limited hearing to resolve disputed jurisdictional facts. *Rural Water Dist. No. 2 v. City of Glenpool*, 698 F.3d 1270, 1272 n. 1 (10th Cir. 2012). Ms. Arabalo bears the burden of proving that her common-law claims overcome the jurisdictional bar created by the CGIA. *Yonker by and through Helstrom v. Thompson*, 939 P.2d 530, 534 (Colo. App. 1997).

Mr. Gutierrez's challenge to the § 1983 claim against him arises under Fed. R. Civ. P. 12(b)(6). In evaluating that portion of the motion, the Court limits its examination to the four corners of the Third Amended Complaint (as well as any documents necessarily incorporated therein), treating all well-pled allegations as true. *See generally Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 941 (10th Cir. 2002); *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009); *Khalik v. United Air Lines*, 671 F.3d 1188, 1191 (10th Cir. 2012).

### 1. Common-law claims

The Court turns first to Mr. Gutierrez's contention that Ms. Arabalo's common-law claims for defamation and outrageous conduct are barred by the CGIA. As a general rule, the CGIA provides that any action sounding in tort, brought against a public employee, arising "out of . . . an act or omission [which occurred] during the performance of his duties and within the scope of his employment" is subject to certain procedural limitations. C.R.S. § 24-101-118(1). Among other things, such procedural limitations include the requirement that the plaintiff file, within 182 days of the plaintiff's discovery of the claimed injury, a "a written notice" (usually

called a Notice of Claim) containing certain specified information, delivered to the governing body of the public entity in question. C.R.S. § 24-10-109(1), (3)(a). As noted above, failure to comply with the Notice of Claim requirement deprives the Court of jurisdiction to consider the tort claims against the public employee.

Both of Ms. Arabalo's common-law claims spring from the same act: Mr. Gutierrez making statements during an Internal Affairs Bureau interview regarding sexual harassment complaints, accusing Ms. Arabalo of embezzling funds from the Foundation. The question presented is whether such statements were made by Mr. Gutierrez "during the performance of his duties and within the scope of his employment": if so, Ms. Arabalo's claims are subject to (and admittedly failed to comply with) the CGIA; if not, the claims are not subject to the Notice of Claim requirement.

Neither party attached any affidavits or evidentiary material meaningful to this issue to their motion papers.[2] Ms. Arabalo's Objections contend that "there is a dispute regarding the circumstances under which [Mr. Gutierrez] made the allegations,"[3] although the record does not

---

[2]     The Court emphasizes here that although it resolves both Mr. Gutierrez's motion to dismiss and the remaining Defendants' summary judgment motion in this Order, it has strictly cabined its analysis of each motion to the particular filings and materials submitted in support of them. In other words, although the other Defendants' summary judgment motion includes evidence that clarifies the circumstances of Mr. Gutierrez's interview, those materials were not presented to the Court during the briefing of Mr. Gutierrez's motion to dismiss, and thus, the Court does not consider those materials or the facts contained therein in any way when resolving Mr. Gutierrez's motion.

[3]     Ms. Arabalo argues in her Objections that, were the Court to permit further development of an evidentiary record, she would show that Mr. Gutierrez did not promptly report his discovery of her alleged embezzlement for several months, and that Mr. Gutierrez purposefully gathered evidence about the issue in advance of the Internal Affairs interview (apparently rebutting a contention, unmade by Mr. Gutierrez on the instant record, that the subject came up naturally during the interview). The Court finds little utility in delaying resolution of this matter

disclose any clear position taken by Mr. Gutierrez on this point, such that Ms. Arabalo could

"dispute" it.  In the absence of any more developed factual record, the Court considers the matter

strictly on the face of the Third Amended Complaint.  It contends that:

> 61.  On January 13, 2011, Internal Affairs conducted an interview
> with Defendant Gutierrez regarding Plaintiff's complaints of
> sexual discrimination. . . .
>
> 62.  During his Internal Affairs interview on January 13, 2011,
> Defendant Gutierrez made allegations to Internal Affairs that
> Plaintiff misappropriated funds from the Foundation. . .
>
> 65.  Upon information and belief, Defendant Gutierrez's false
> embezzlement allegations were submitted to the Denver Police
> Department on April 13, 2011.
>
> 66. As a result of Defendant Gutierrez's false allegations, grand
> jury proceedings commenced for several weeks . . . .

Neither party points to Colorado law that squarely interprets the terms "during the

performance of his duties and within the scope of his employment," as that phrase is used in the

CGIA.  In *Capra v. Tucker*, 857 P.2d 1346, 1348 (Colo.App. 1993), the court considering this

same question (considering the application of the CGIA in the context of a two-car auto accident

involving a state patrol officer driving a state-owned vehicle from his home to his place of

employment) turned to principles of state Worker's Compensation law to interpret the phrase.

Under those principles, the Court considers the totality of the circumstances in order to decide

---

so that Ms. Arabalo can produce the evidence she claims to possess.  The proper time to produce
such evidence was either in response to Mr. Gutierrez's motion in the first instance, or, at the
very least, at the time of her Objections, not to await some signal from the Court that it desired
additional evidence.  *See e.g. Kesler v. Barris, Sott, Denn & Driker, PLLC*, 482 F.Supp.2d 886,
890 (E.D.Mi. 2007) (in reviewing objections to a Magistrate Judge's recommendation, District
Court may permit the parties to supplement the record with additional evidence, but is not
required to do so), *citing* Wright, Miller *et al*., Federal Practice and Procedure, § 3070.2 (2d Ed.).
In any event, the Court finds that, even if it were to accept Ms. Arabalo's proffer on these points,
the Court's analysis and ruling would not change.

whether the employee is "participat[ing] in activities assigned or directed by the employer" when the injury in question occurs. *Maryland Cas. Co. v. Messina*, 874 P.2d 1058, 1063 (Colo. 1994). Among other things, the Court examines "whether the activity occurred during working hours; whether it was on or off the employer's premises; whether the activity was contemplated by the employment contract; and whether the obligations of employment created [the circumstances] out of which the injury arose." *Id.*

Here, there can be little argument that Mr. Gutierrez's participation in the Internal Affairs interview on January 13, 2011 occurred during the performance of his duties and within the scope of his employment with the Sheriff's Department. The Third Amended Complaint makes clear that the interview was conducted by the Department's Internal Affairs Bureau – unambiguously a branch of the employer itself – and the purpose of that inquiry was to obtain information regarding Ms. Arabalo's complaints that she had been subjected to sexual harassment and discrimination by Mr. Gutierrez in the workplace and during working hours. Although the Third Amended Complaint does not specify a particular time of day or location in which the interview took place, the only logical conclusion that the Court can reach from the allegations listed above is that Mr. Gutierrez's participation in the interview was at the direction of the Department, and thus, within the scope of his duties and employment.

The narrower question is whether Mr. Gutierrez, in accusing Ms. Arabalo of embezzlement from the Foundation, so deviated from the stated purpose of the interview – investigation of complaints of sex discrimination – that he was no longer within the scope of his employment when making those allegations. As noted above, the record as to how the issue of Ms. Arabalo came up during the interview is not revealed by the Third Amended Complaint or

10

any other evidence in the record.  It may be that the Internal Affairs investigator specifically inquired of Mr. Gutierrez about Ms. Arabalo's own conduct or credibility, or it may be that Mr. Gutierrez unilaterally chose to interject the issue into an interview that otherwise was unconcerned with it.  In the interests of giving Ms. Arabalo the maximum benefit of the doubt, the Court will assume, as she asserts, that Mr. Gutierrez raised the issue entirely gratuitously and of his own initiative.

In considering whether an employee diverting a clearly work-related investigation into a discussion of allegations of unlawful off-duty conduct by a co-worker nevertheless occurs within the scope of employment, the Court takes some collateral guidance from a seemingly-unrelated but typical Worker's Compensation issue: whether an injury sustained during employee's off-duty, off-premises physical travel (*e.g.* commuting to or from work, traveling over a lunch break, etc.) is nevertheless compensable because it occurs within the "scope of employment."  Despite their superficial dissimilarity, there is a conceptual link between these types of conduct: both entail the employee stepping outside of his or her clearly-defined job duties in order to take on a matter (lunch, accusations against an enemy) that might be viewed as being of purely personal interest to the employee.  In addressing this frequent issue in the Worker's Compensation field, courts posit the general rule that such conduct is normally considered to be outside the scope of employment, but if it is undertaken "at the express or implied request of the employer, or if [it] confers a benefit on the employer," it falls within the scope of employment.  *Varsity Contractors and Home Ins. Co. v. Baca*, 709 P.2d 55, 56 (Colo.App. 1985).  Thus, even if Mr. Gutierrez raised the issue of Ms. Arabalo's conduct to the Internal Affairs investigators of his own initiative, such conduct was nevertheless within the scope of his employment if it can be said that

the Department either expressly or impliedly "requested" that Mr. Gutierrez volunteer such allegations, or if the Department derived some benefit from Mr. Gutierrez doing so. Both situations appear to be present here.

Mr. Gutierrez argues that Department policies expressly obligated him to report his concerns about potential illegal conduct (even, arguably, off-duty conduct) by Ms. Arabalo. Even if the Court cannot say that the Department policies identified by Mr. Gutierrez expressly required to report the conduct in the circumstances identified here, it is entirely logical to presume that a law enforcement agency like the Department would at least impliedly expect its employees to report any concerns they had about potential illegal conduct (on-duty or off-duty) by a fellow employee. Even off-duty conduct of this type has potential ramifications on the employee's fitness for duty as a law enforcement officer. Thus, although one might take issue with the timing of Mr. Gutierrez's leveling of allegations of embezzlement against Ms. Arabalo (*i.e.* that he should have brought them to the attention of Internal Affairs separately from the inquiry into his potentially discriminatory conduct), it cannot be reasonably disputed that the Department fully expected that Mr. Gutierrez would bring such allegations to its attention at some point in time.[4] Thus, even if Mr. Gutierrez traveled outside the scope of the January 13,

---

[4]      The Court understands Ms. Arabalo's position to be that the allegations were wholly fabricated by Mr. Gutierrez. One could argue, the Department had no express or implied requirement that employees report entirely made-up allegations of unlawful conduct by co-workers (*e.g.* for spite or retribution, or merely as horseplay). Although the latter premise follows logically from the former, the Court finds the record insufficient to support Ms. Arabalo's factual predicate: that Mr. Gutierrez knew that the allegations of embezzlement against Ms. Arabalo were fabricated.

In this sense, one must consider the source of the evidence in the record. Ms. Arabalo's Third Amended Complaint reflects Ms. Arabalo's view of the facts, but her perception that Mr. Gutierrez fabricated the embezzlement allegations from whole cloth does not necessarily suffice to allege that Mr. Gutierrez himself knew those allegations to be false. In the absence of

2011 interview to do so, his act of raising the embezzlement allegations is consistent with the Department's implicit (if not explicit) expectation that he would bring such concerns to its attention as part of his duties.  As such, the act of raising the concerns was necessarily within the scope of Mr. Gutierrez's employment with the Department.

It is also apparent that Mr. Gutierrez's allegations conferred a benefit on the Department in several ways.  As noted above, a law-enforcement agency like the Department necessarily has an interest in ensuring that its employees are not involved in unlawful behavior.  Moreover, the Third Amended Complaint makes clear that, although Ms. Arabalo's alleged embezzlement involved an entity other than the Department itself, the Foundation nevertheless had a connection to the Department that nevertheless rendered any misconduct directed at the Foundation to be of particular interest to it.  The Third Amended Complaint describes the Foundation as "benefit[ing] . . . the Department" and that its specific purpose was to "provide financial assistance to the Department's [personnel]." The Foundation's name expressly incorporates the phrase "Denver Sheriff," drawing a necessary association in the minds of the public between the Foundation and the Department.  Thus, it is entirely appropriate to infer that the Department had a particular interest in being advised of any misconduct committed by Department employees during the

---

evidence – *e.g.* an admission from Mr. Gutierrez – of that fact, the Court cannot say that this record permits the conclusion that Mr. Gutierrez himself disbelieved his own allegations, such that he would not be expected to report such concerns to the Department.

In any event, there is some evidence in the record to indicate that at least the general outline of Mr. Gutierrez's allegations had some kernel of truth.  Mr. Gutierrez's motion attaches Ms. Kilroy's March 16, 2012 letter of termination to Ms. Arabalo, which recites some facts regarding the Department's investigation into Mr. Gutierrez's allegations.  That letter indicates, among other things, that Ms. Arabalo admitted that her daughter had made personal use of a credit card issued by the Foundation to Ms. Arabalo for Foundation use, and that Ms. Arabalo admitted receiving cash payments and payment of personal expenses from the Foundation (payments that at least some of the Foundation's Board members considered to be improper).

13

course of their work with the Foundation.  Moreover, the fact that Mr. Gutierrez's report eventually prompted the Department to turn the matter over to the Denver Police Department for potential criminal prosecution indicates that the Department considered the matter to be particularly serious.  Under these circumstances, the record amply supports the conclusion that the Department derived a benefit from being advised by Mr. Gutierrez of potential misconduct by Ms. Arabalo towards the Foundation, such that Mr. Gutierrez's report can be considered to have been an act taken within the scope of his employment.

The Magistrate Judge premised his recommendation on various cases that, he concluded, demonstrate that a law enforcement officer's obligation to comply with Internal Affairs investigations necessarily arise within the scope of employment.  Ms. Arabalo's Objections argue that some of these cases are inapposite for the proposition for which the Magistrate Judge cites them.  Interestingly, however, Ms. Arabalo does not address the case upon which the Magistrate Judge most heavily relied, *Harris v. City of Colorado Springs*, 867 P.2d 217 (Colo. App. 1993).  There, the plaintiff police officer was instructed to answer questions during an internal affairs investigation into a traffic incident that the officer had been involved in on his off-duty time.   The officer refused to participate in the investigation, and sought a declaration that he was required to cooperate with such investigations "only in circumstances in which the off-duty conduct involved was specifically, directly, and narrowly related to the performance of [his] official duties." *Id.* at 218.  The trial court found that he was obligated to participate in the investigation and the Court of Appeals affirmed.  It noted that "[w]hile not all off-duty conduct will have a significant effect on a public servant's official duties, off-duty conduct can be the subject of scrutiny" by the agency if it "concern[s] an individual's fitness for public service." *Id.*

14

at 219.  It agreed that "any inquiry into private conduct must bear a rational connection to the officer's position as a public servant," but observed that "off-duty police officers have an official duty to take police action when necessary" (and, by necessary implication, to avoid engaging in unlawful actions, even when off-duty).  *Id.*

The reasoning in *Harris,* which Ms. Arabalo does not address, closely conforms with this Court's analysis above: although Ms. Arabalo's alleged embezzlement occurred in an off-duty capacity, her status as a law-enforcement officer nevertheless rendered that conduct relevant to her fitness for public service.  This made the issue of her alleged embezzlement of relevant concern to the Department, such that Mr. Gutierrez was expected to bring it to the attention of the Internal Affairs Bureau.  Once it is accepted that Mr. Gutierrez was obligated to advise the Department of his concerns, the question of whether it was proper to do it as a tangent to the inquiry into his alleged discrimination or as part of a separate complaint is immaterial.  The accusation was made within the scope of his employment, and thus, Ms. Arabalo's claims against him arising out of that accusation are subject to the procedural requirements of the CGIA.

Because it is undisputed that Ms. Arabalo did not comply with the Notice of Claim requirements in the CGIA, the Court lacks jurisdiction over her common-law claims against Mr. Gutierrez, and those claims are dismissed.

### 2. § 1983 claim

Ms. Arabalo's remaining claim against Mr. Gutierrez sounds in equal protection under § 1983.  The Equal Protection clause is "essentially a direction that all persons similarly situated should be treated alike."  *Allstate Sweeping, LLC v. Black*, 706 F.3d 1261, 1265 (10th Cir. 2013).  The 10th Circuit has held that public employees "possess[ ] a clearly established right to be free

of [sexual] harassment" under § 1983.  *Maestas v. Lujan*, 351 F.3d 1001, 1009 (10th Cir. 2003).

In order to state a § 1983 claim premised on sexual harassment by Mr. Gutierrez, Ms. Arabalo must allege: (i) that he deprived her of her constitutional right to equal protection; (ii) that he acted under color of state law; and (iii) his actions were the proximate cause of her injuries.  *Id.* at 1012 n. 1.  To establish the key element of a constitutional deprivation, Ms. Arabalo must allege facts sufficient to show: (i) that Mr. Gutierrez subjected her to sexual discrimination or conduct; (ii) that the conduct was unwelcome; and (iii) that it was sufficiently severe or pervasive so as to create a hostile or abusive working environment.  *See Escue v. Northern OK College,* 450 F.3d 1146, 1157 (10th Cir. 2006); *see also Fye v. Oklahoma Corp. Com'n.*, 175 Fed.Appx. 207, 210 (10th Cir. 2006) (unpublished) (noting that the conduct must be "both subjectively and objectively hostile or abusive" and that the concepts of severity and pervasiveness "are interdependent: the more severe the conduct, the less pervasive it needs to be" and *vice-versa*).

The Magistrate Judge first found that, to state a claim against Mr. Gutierrez under § 1983, Ms. Arabalo was required to allege that Mr. Gutierrez was either: (i) her supervisor; or (ii) that he exercised "state authority" over her.  *Citing Maestas*, 351 F.3d at 1012.  Ms. Arabalo does not dispute that this is a correct statement of the law.  The Magistrate Judge found that the Third Amended Complaint alleges that Mr. Gutierrez "was in an acting supervisory capacity on only two days, August 26-27, 2010" and that at all other times, "was a peer of [Ms. Arabalo]."  Ms. Arabalo contends that this finding is erroneous, arguing that although Mr. Gutierrez was officially her supervisor only on those two days, he nevertheless possessed state authority over her throughout the time period at issue.  Specifically, she points to Paragraph 77 of her Third

Amended Complaint, which states "During each instance of this sexual harassment of Plaintiff, Defendant Gutierrez was employed by the City in a managerial or supervisory capacity, and at various times he directly supervised Plaintiff or was considered to be in a position of authority over Plaintiff."

This Court finds no material error in the analysis by the Magistrate Judge.[5]  The quoted portion of the Third Amended Complaint essentially consists of two separate assertions: (i) that throughout the time period at issue, Mr. Gutierrez "was employed in a . . . supervisory capacity" (although not necessarily as a supervisor of Ms. Arabalo); and (ii) that "at various times," Mr. Gutierrez was Ms. Arabalo's supervisor or exercised authority over her.  The first assertion – that Mr. Gutierrez had a supervisory role somewhere in the Department throughout the time period at issue – is largely irrelevant, at least to Ms. Arabalo's § 1983 claims against Mr. Gutierrez directly.[6]  The fact that Mr. Gutierrez supervised <u>somebody</u> does not suffice to allege that he supervised <u>Ms. Arabalo</u>, as is required for her § 1983 claim against him.  The second assertion acknowledges that Mr. Gutierrez supervised her directly or exercised authority over her "at various times," but does not – with the exception of August 26-27, 2010 – specify what those times were.  The Third Amended Complaint does not necessarily permit the inference that the "various times" that Mr. Gutierrez "exercised authority" over Ms. Arabalo correspond with the

---

[5]     The Court's review of the Third Amended Complaint reveals no allegation from which the Magistrate Judge could conclude that Mr. Gutierrez and Ms. Arabalo were primarily "peers." However, that conclusion may necessarily flow from the conclusion that Mr. Gutierrez only served as her formal supervisor for a two-day period, if one assumes that Mr. Gutierrez's status relative to Ms. Arabalo must necessarily be one of two possibilities: "supervisor" or "peer."

[6]     The Court notes that Paragraph 77 is found in the allegations supporting Ms. Arabalo's Title VII claim against Denver, not part of her § 1983 claim against Mr. Gutierrez (although her § 1983 claim against Mr. Gutierrez does incorporate that paragraph by reference).

dates on which Mr. Gutierrez engaged in the harassing acts identified in Paragraphs 39-41.[7]
Although it is possible that these acts occurred at a time when Mr. Gutierrez had authority over
her, *Iqbal* requires more: "where the well-pleaded facts do not permit the court to infer more than
the mere possibility of misconduct," the pleading is insufficient.  556 U.S. at 679.

Ms. Arabalo argues in her Objections that even if her allegations of Mr. Gutierrez's
continuing authority over her are insufficient, courts nevertheless recognized that "in certain
instances, co-employees may exercised de facto authority over sexual harassment victims such
that they act under the color of law.  *Citing David v. City and County of Denver*, 101 F.3d 1344,
1354 (10th Cir. 1996).   Even accepting this precedent, Ms. Arabalo's Third Amended Complaint
pleads no particular facts from which the Court could conclude that this is one of those "certain
instances" where conduct by a mere co-worker nevertheless gives rise to a finding of a possible
use of state action to facilitate the harassment.  Other than the statements quoted above, it offers
no particular allegations (specific or conclusory) that elaborate on Mr. Gutierrez's role in the
Department, or the degree to which that role allowed him to exercise "de facto authority" over
Ms. Arabalo.  The absence of such allegations, particularly under post-*Iqbal* pleading standards,
prevents Ms. Arabalo from salvaging the claim on these grounds.

Thus, the Magistrate Judge properly limited his analysis to those acts of harassment by
Mr. Gutierrez that Ms. Arabalo identifies as having occurred on August 26-27, 2010.   The Third

---

[7]      If anything, the structure of the sentence in Paragraph 77 suggests the opposite.  If Mr.
Gutierrez was exercising authority over Ms. Arabalo during the other occasions on which he
allegedly harassed her, there would be no reason for the "at various times" language in that
sentence; it would be sufficient for Ms. Arabalo to allege that "During each instance of his
sexual harassment . . . he directly supervised Plaintiff or was considered to be in a position of
authority over Plaintiff."   The presence of the "at various times" language thus suggests that
some or all of the other acts of harassment occurred at times when Mr. Gutierrez was neither Ms.
Arabalo's supervisor nor in a position of authority with regard to her.

Amended Complaint alleges that on these dates: (i) Mr. Gutierrez "asked Plaintiff to lift up her shirt and motioned for her to sit on his lap since he was the Acting Chief," and he "asked her to sit on his lap and he would give her a 'big surprise'"; and (ii) he called her and, in the presence of other Department employees, "greeted Plaintiff by asking what she was wearing."

The Court agrees with the Magistrate Judge's reasoning that these two acts are legally insufficient to plead an objectively severe or pervasively hostile working environment. As noted above, severity and pervasiveness operate in juxtaposition: the more severe the conduct at issue, the less pervasive it need be. *Fye*, 175 Fed.Appx. at 210. The two events recited are not particularly pervasive (particularly in light of Ms. Arabalo's lengthy tenure with the Department), nor are they especially severe. As the Supreme Court directed in *Clark County School Dist. v. Breeden*, 532 U.S. 268, 270-71 (2001), when assessing the severity of alleged harassment, the Court should consider factors such as "whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Mr. Gutierrez's comments are certainly inappropriate for the workplace and Ms. Arabalo was likely annoyed and frustrated at having to endure them. However, they were not physical in nature, must less physically threatening or humiliating." Nor is there any indication in the Third Amended Complaint that the comments prevented Ms. Arabalo from performing her work adequately. Although the Court agrees that such juvenile conduct is inappropriate in the workplace, it merely amounts to the type of "simple teasing, offhand comments, and isolated incidents [that] will not amount to discriminatory changes in the terms and conditions of employment." *Id.* at 271; *accord Sprague v. Thorn Americas, Inc.*, 129 F.3d 1355, 1366 (10th Cir. 1997) (under Title VII, finding "five separate incidents over a span of

19

approximately sixteen months," among which the harasser told the plaintiff to undo the top button on her shirt, and put his arm around her and looked down her dress, stating "you got to get it when you can," was "unpleasant and boorish" but insufficiently severe or pervasive to constitute actionable harassment).[8]

Accordingly, the Court finds no material error in the Magistrate Judge's Recommendation, and therefore adopts it.  Mr. Gutierrez's motion to dismiss is granted.

### B.  Motion for summary judgment

The Court then turns to the remaining Defendants' motion for summary judgment.[9]

---

[8]     As the Magistrate Judge observed, even if Ms. Arabalo's remaining contentions regarding Mr. Gutierrez in paragraphs 39-41 are considered, the result is the same.  Two of those paragraphs are entirely conclusory, stating merely that Mr. Gutierrez "made sexual comments" at "various times," with such conduct becoming "more frequent and vulgar" after the 2009 rape incident.  The only specific instance recited is that "on one or more occasions," Defendant Gutierrez "requested that [she] shut the door, sit on his lap, come around his desk and unbutton her blouse."  This additional allegation, even if credited, fails to elevate Ms. Arabalo's claims over the type of conduct described in *Sprague*.

[9]     As a general matter, the Court finds the Defendants' initial summary judgment motion to be materially deficient.  Fed. R. Civ. P. 56(a) requires the movant to "show[ ] that there is no genuine dispute as to any material fact," and Rule 56(c)(1)(A) requires that "a party asserting that a fact cannot be . . . genuinely disputed must support that assertion by citing to particular parts of materials in the record. . . ."  Thus, it is incumbent upon the Defendants' initial motion to cite to specific evidence in the record that supports their contentions that Ms. Arabalo cannot genuinely dispute particular facts.

The Defendants' motion instead plays coy, arguing, usually without any citation to supporting evidence, that Ms. Arabalo "will be unable to show" certain general facts or "will be unable to establish" certain elements.  In other words, the Defendants largely foist off the burden of identifying the relevant facts onto Ms. Arabalo, and marshal their first response to her in their reply brief.  The Defendants have had a full opportunity to conduct discovery in this action and are fully apprised of Ms. Arabalo's version of the relevant facts.  Thus, it is incumbent upon the Defendants, in their initial motion, to specifically identify the pertinent facts that Ms. Arabalo has claimed and to show, with specific citation to the record, how those facts fail to establish a genuine dispute as to the existence of one or more elements.

This is unacceptable (and a violation of the requirements of MSK Practice Standard (Civil) § V.I.3..1.c.), and even smacks of unprofessional gamesmanship.  Recurrence of this

1.  Standard of review

Rule 56 of the Federal Rules of Civil Procedure facilitates the entry of a judgment only if no trial is necessary. *See White v. York Intern. Corp.*, 45 F.3d 357, 360 (10th Cir. 1995). Summary adjudication is authorized when there is no genuine dispute as to any material fact and a party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Substantive law governs what facts are material and what issues must be determined. It also specifies the elements that must be proved for a given claim or defense, sets the standard of proof and identifies the party with the burden of proof. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Kaiser-Francis Oil Co. v. Producer's Gas Co.*, 870 F.2d 563, 565 (10th Cir. 1989). A factual dispute is "genuine" and summary judgment is precluded if the evidence presented in support of and opposition to the motion is so contradictory that, if presented at trial, a judgment could enter for either party. *See Anderson*, 477 U.S. at 248. When considering a summary judgment motion, a court views all evidence in the light most favorable to the non-moving party, thereby favoring the right to a trial. *See Garrett v. Hewlett Packard Co.*, 305 F.3d 1210, 1213 (10th Cir. 2002).

If the movant has the burden of proof on a claim or defense, the movant must establish every element of its claim or defense by sufficient, competent evidence.[10]  *See* Fed. R. Civ. P.

---

practice in this or any future case in which Defendants' counsel participate may result in the imposition of sanctions against counsel personally.

[10]     The Court emphasizes here that although Ms. Arabalo's Third Amended Complaint pleads her various claims in fairly broad and general terms, this Court has turned to Ms. Arabalo's summary judgment response to narrow and clarify those claims for purposes of analyzing the summary judgment motion. To the extent the claims are somehow cognizable on a theory or factual basis other than those specifically-identified by Ms. Arabalo in her response brief, the Court deems such claims waived or abandoned.

56(c)(1)(A).  Once the moving party has met its burden, to avoid summary judgment the responding party must present sufficient, competent, contradictory evidence to establish a genuine factual dispute.  *See Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991); *Perry v. Woodward*, 199 F.3d 1126, 1131 (10th Cir. 1999).  If there is a genuine dispute as to a material fact, a trial is required.  If there is no genuine dispute as to any material fact, no trial is required.  The court then applies the law to the undisputed facts and  enters judgment.

If the moving party does not have the burden of proof at trial, it must point to an absence of sufficient evidence to establish the claim or defense that the non-movant is obligated to prove. If the respondent comes forward with sufficient competent evidence to establish a *prima facie* claim or defense, a trial is required.  If the respondent fails to produce sufficient competent evidence to establish its claim or defense, then the movant is entitled to judgment as a matter of law.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

## 2. Title VII claim – hostile environment

Ms. Arabalo's first claim against Denver is for hostile environment sexual harassment against Denver under Title VII.   To establish that claim, Ms. Arabalo must show: (i) that she was subjected to unwelcome intimidation, ridicule, or insult; (ii) that such conduct was directed at her because of his sex; (iii) that the conduct was sufficiently severe, in both an objective and subjective sense, to alter the terms and conditions of her employment; and (iv) that there is some basis to hold Denver liable for that conduct.  *Harsco Corp. v. Renner*, 475 F.3d 1179, 1186 (10th Cir. 2007).   Denver challenges Ms. Arabalo's ability to establish the third element – that the hostile environment was sufficiently severe or pervasive.

The Court begins by addressing, in somewhat greater detail, the particular forms of harassment alleged by Ms. Arabalo.  First, she contends that, beginning in or about December 2008, she was subjected to vulgar comments and conduct by various inmates at the jail after a news report involving the dissemination of sex tapes in the Denver Police Department included reference to an individual named "Arabalo."  She describes being "catcalled" and whistled at by numerous inmates, having inmates yell "it's the sex captain" when she was nearby, and overhearing inmates asking "if I was the one from the sex tape."[11]  She reported this behavior to various officials at the Department, requesting that she be transferred out of the jail to alleviate the situation, but was instead instructed to change her uniform name tag to her maiden name, or to "lay low" and "let it pass."  She was eventually transferred out of the jail in approximately June 2009.

The Defendants contend that harassing conduct by inmates should be afforded little significance.  Citing various cases, the Defendants contend that "inmate conduct, without more, is an insufficient predicate for a hostile environment claim" and argue that "by choosing to work in a prison, corrections personnel have acknowledged and accepted the probability that they will face inappropriate and socially deviant behavior."  *Citing Maine v. Oklahoma Dept. of Corrections*, 1997 WL 602688 (10th Cir. 1997) (slip op.) *and Powell v. Morris*, 37 F.Supp.2d 1011, 1017 (S.D.Oh. 1999).  However, these cases do not stand for that precise proposition.  In *Maine*, the 10th Circuit found that a prison librarian failed to demonstrate that a work environment that included "inmates who behaved in an overtly sexual manner" toward her was

---

[11]      Ms. Arabalo also describes at least two instances in which inmates masturbated in front of her, but admits that she used her authority to initiate disciplinary proceedings against those inmates, and that both inmates were punished for the conduct.  She does not allege that she experienced further harassment from these inmates.

sufficiently hostile to permit a claim under Title VII, because "the actions of those inmates . . .

cannot . . . be attributed to [the employer]." *Id.*   Notably, however, the court also observed that

the employer "did discipline many of these inmates in response to plaintiff's complaints."

Similarly, *Powell* observes that "courts have repeatedly declined to impose sexual harassment

liability upon correctional institutions for the sexually offensive conduct of inmates, as long as

the defendant institution took proper preventive and remedial steps with regard to inmate

behavior."  37 F.Supp.2d at 1017.  Thus, these cases stand for the proposition that although

Denver cannot be held liable simply because inmates made offensive comments towards Ms.

Arabalo, it <u>can</u> be liable if it failed to take appropriate remedial steps in response to Ms.

Arabalo's complaints about inmate conduct.

Thus, the question becomes whether Ms. Arabalo can show that Denver failed to take

appropriate remedial action to address her complaints of being harassed by inmates.  According

to Ms. Arabalo's submissions, she raised complaints about the inmates' harassment to several

jail officials, as was told variously to "write it all down and save it for a lawsuit," to "lay low"

and "let it pass," and to "change [her] name tag to her maiden name."  Ms. Arabalo requested

that she be transferred out of the jail and into positions that were available, but that request was

denied.[12]  Denver contends that it "has policies in place to address inmate misconduct," pointing

(without any specific page reference) to a 46-page inmate handbook and to Ms. Arabalo's

---

[12]      Although Ms. Arabalo recites that she was told there were no available positions
(including at least one specific position at "PADF" that she contends could have been made
available to her), the Court understands her to disagree with this contention.  Denver's motion
and response do not affirmatively assert that it was impossible to alleviate Ms. Arabalo's
exposure to the inmate harassment by transferring her.  Thus, taking the evidence in the light
most favorable to Ms. Arabalo, the Court will assume that it may have been possible for her to
avoid the inmate harassment by being transferred to another open position.

testimony that she was able to write up disciplinary charges on certain inmates who masturbated in her presence. But Denver does not address the reasonable efforts it took (if any) to shield Ms. Arabalo from inmate harassment taking the form of  comments, catcalls, or gestures, particularly where it was impossible for Ms. Arabalo to specifically identify the inmate who did so..[13]  In the absence of such evidence, this Court cannot say that, as a matter of law, Denver's efforts to protect Ms. Arabalo from inmate harassment were sufficient, such that the incidents of inmate harassment directed at her can be disregarded in this action.

Next, Ms. Arabalo addresses the October 2009 incident in which she was raped in her home by two fellow Department employees.  It is largely unnecessary to detail the circumstances of that incident, except to note that it is undisputed that the incident occurred when all involved were off-duty and off-premises.  The following day, Ms. Arabalo reported the matter to her supervisor, Mr. Deeds, who told her that "the best thing I could do was nothing because it was my word against theirs and it would get around the Department."  The record is not entirely clear, but it appears that, notwithstanding her reporting of the incident, Ms. Arabalo was required to occasionally supervise the two Deputies after the incident.[14]  Denver's response to this issue is

---

[13]    The record reflects additional instances in which Ms. Arabalo lodged formal reports about harassing conduct by inmates that went ignored by her superiors.  She references a May 24, 2010 incident in which an inmate "stated that it smelled like fish in there" and "stated that he wondered if I sucked Chief Diggins' big old dick."  Ms. Arabalo states that she wrote up the inmate and reported the incident to a supervisor, but "nothing was done."  Indeed, she contends that other employees of the Department saw the report and teased her about it, saying "I hear you have a new boyfriend."

[14]    The Court gleans this fact from Ms. Arabalo's responses to the Defendants' interrogatories (which, the Court notes, are signed by Ms. Arabalo's counsel and not Ms. Arabalo herself, but the Defendants have not registered any objection to the Court's consideration of that document).   Those responses state that "It was extremely difficult to return

relatively brief, noting only that the incident occurred off-duty, that Ms. Arabalo did not mention the incident in her EEOC and CCRD charges, and that she "has not alleged a single incident of harassment by [the two Deputies] that occurred in the workplace or at any employment-related function."

Although the Court is slightly troubled by the lack of specificity in the record about the degree to which Ms. Arabalo was required to have further employment-related contact with the two Deputies after the incident, the record, construed in Ms. Arabalo's favor, suggests that some such contact was required.  Thus, although the Court agrees with Denver that the occurrence of the off-duty, off-premises rape itself may not factor into the analysis of whether Ms. Arabalo was subjected to a hostile working environment, the fact that Ms. Arabalo was forced to have further employment contact with the two Deputies, and that no apparent corrective or remedial action was taken by Denver to isolate her from the two Deputies, is a fact that bears on the severity of the hostile environment.

Ms. Arabalo also offers her own affidavit, attesting to several instances of harassment by Mr. Gutierrez.  She states that his harassment began in 2008, in that "he would say things once and awhile (sic) that were inappropriate," and gives a single example: Mr. Gutierrez noted that her shirt was unbuttoned that the she "was bursting out of" it, telling her she "should not be buttoning it, but rather unbuttoning it."  (She told him to "stop it.")  She contends that the harassment became more prevalent beginning in 2010, when he began "ma[king] comments about the size of my chest, ask[ing] if they were real" and making "inappropriate comments regarding me sexually."  On one occasion, he told her "that another female deputy was hitting on

---

to work and supervisor (sic) the two officers who raped me."  The Court assumes that "supervisor" is a typographical error, and should be "supervise."

him and he was really tempted" because "females liked . . . that he had the power" now that he was a Captain. (She "would remind him that he was married.") She mentions an instance when, while moving around the office on crutches, "my blouse came open a little" and she could not immediately adjust it, so she "hurried to the desk and turned my back and buttoned it." The following day, Mr. Gutierrez "asked me about the incident and asked me to re-enact it for him." (The record does not reveal how Mr. Gutierrez became aware of the incident in the first place.) On another occasion, when she went to his office for an assignment, he asked her to close the door and then "came on to [her] in the office." She "told him to stop and then opened the door."

She recites the August 26 and August 27, 2010 instances referenced in the Third Amended Complaint. On August 26, while off-duty, she went to Mr. Gutierrez's office to pick up some checks for the Foundation. Mr. Gutierrez, who was on a telephone call, motioned for her to lift her shirt up. Ms. Arabalo refused, and loudly stated "what is it you want me to do?," in the hopes that the person on the other end of the phone would hear. Mr. Gutierrez completed the phone call and gave Ms. Arabalo the checks. As she was leaving, he "grabbed [her] arm[15] and motioned for [her] to sit" on his lap, telling her he had a "big surprise" for her. By contrast, the August 27, 2010 incident described in the Third Amended Complaint loses some significance when its details are revealed: Ms. Arabalo states that she purposefully called Mr. Gutierrez "with the intent of capturing his harassment on tape," and that when she identified herself on the phone, he responded "what are you wearing?" Ms. Arabalo responded "clothes," and Mr. Gutierrez stated "oh that's all?" Ms. Arabalo states that she asked Mr. Gutierrez where he was, and he responded that he was "in the receiving unit talking to the guys." She concludes that this

---

[15]     In another reciting of the instance, Ms. Arabalo states that "he placed his hand on my arm."

"means that he made this statement in front of other deputies," although Ms. Arabalo's version of the story reveals no facts from which the "other deputies" would have know that it was Ms. Arabalo (or even a co-worker, or even a female) that Mr. Gutierrez was talking to.

Ms. Arabalo's affidavit does not indicate that she lodged any particular complaint about Mr. Gutierrez's conduct with any higher-level official at the Department; it only mentions her reporting his conduct to the Investigator at the CCRD with whom Ms. Arabalo had filed a charge of discrimination. (She states that "I did not feel I could report it to my superiors as I feared retaliation.")  Presumably, the Department received notice of Ms. Arabalo's complaints against Mr. Gutierrez at the time it was served with her CCRD charge, but the record does not reflect any subsequent instances in which Mr. Gutierrez engaged in sexually-harassing behavior towards her.

With this recitation in mind, the Court turns to the first element of a sexual harassment claim: whether these events, collectively, constitute conduct sufficiently severe or pervasive as to constitute a sexually-hostile working environment.  In the regard, the Court finds the evidence relatively thin.  The Court previously characterized Mr. Gutierrez's behavior, as recited in the Third Amended Complaint, as being merely "juvenile" and "simple teasing," and the factual development of those allegations merely confirms that conclusion.  Ms. Arabalo identifies only a handful of specific instances of inappropriate conduct by Mr. Gutierrez occurring over a period of at least two years.  All of that conduct was verbal, with the exception of Mr. Gutierrez "grabbing her arm" during the August 26, 2010 incident, a physical contact that appears to have been brief and non-threatening.  Although Mr. Gutierrez's conduct was sexist, offensive, and annoying, it was not expressly hostile or abusive, and the record reflects that Ms. Arabalo did not

hesitate to reject or rebuff his advances or tell him to stop.   The record does not reflect any occasion in which Ms. Arabalo complained about Mr. Gutierrez's behavior to his supervisor, a fact which further suggests that the conduct was not perceived as particularly severe.  Given the relatively infrequency[16] of the conduct described by Ms. Arabalo, and its comparatively mild severity, the Court would find that Mr. Gutierrez's conduct, taken alone, would be insufficient to support a hostile environment claim against Denver.

But that does not end the inquiry.  As noted above, Ms. Arabalo was also subjected to harassment from inmates that went largely unaddressed by Denver, and may have been forced to continue to supervise the two Deputies who raped her.  Unlike Mr. Gutierrez's childish teasing, these instances possess a more threatening character, as both situations involve an undercurrent of potential physical violence directed at Ms. Arabalo.  Unlike the situation with Mr. Gutierrez, Ms. Arabalo brought her concerns about these incidents to her superiors, sometimes repeatedly, only to be told to ignore the conduct.  Thus, these instances of harassment are both more severe and, at least in the case of the inmates, more pervasive than Mr. Gutierrez's conduct.  The record reflects that the inmate taunting did affect Ms. Arabalo's ability to work to some extent, insofar as she requested to be transferred out of the jail unit.

---

[16]    Ms. Arablo's affidavit, and indeed the record as a whole, is relatively silent with regard the frequency of Mr. Gutierrez's conduct.  As noted above, she alleges that harassing conduct occurred "once [in a] while" in 2008.  Although it "picked up" in 2010, she offers no particular quantification – she does not, for example, characterize it as "daily," "weekly," "constant," etc. The specific instances she recites sometimes speak in the plural sense: he made "comments," but it is not apparent whether Ms. Arabalo is attempting to describe a single instance with multiple comments, occasional instances of comments, or a near-daily deluge.   In the absence of even relative allegations of frequency, the Court can only assume that the specific examples Ms. Arabalo gives are representative of the frequency of the conduct.

Admittedly, Ms. Arabalo has received the benefit of favorable inferences with regard to both of these categories of harassment: the Court has assumed that Ms. Arabalo can show that Denver could reasonably have protected her against the inmate harassment by moving her to an open position, and has assumed that Ms. Arabalo was required to interact with and supervise the two Deputies that raped her.  It may very well be that the proof at trial shows these inferences to be unwarranted, and in such case, Denver may be entitled to judgment as a matter of law in its favor pursuant to Fed. R. Civ. P. 50.  But at this juncture, taking the evidence in the light most favorable to Ms. Arabalo and viewing the entire course of harassing conduct directed at her as a whole, the Court finds that she has sufficiently demonstrated a triable issue of fact as to whether she was subjected to a sexually-hostile working environment that was sufficiently severe or pervasive.

Denver requests that, if Ms. Arabalo's hostile environment claim is permitted to proceed, the Court nevertheless grant it summary judgment on its own affirmative defense under *Faragher* and *Ellerth*.  Summarized, those cases stand for the propositions that: if the employee has not suffered any tangible employment action as a result of the harassment, the employer may invoke an affirmative defense to liability by showing that it exercised reasonable care to prevent and correct promptly and sexually harassing behavior, and that the employee unreasonably failed to take advantage of any corrective opportunities provided by the employer; on the other hand, if the harassment did result in a tangible employment action, the employer is necessarily vicariously liable for it.  *Burlington Industries, Inc. v. Ellerth,* 524 U.S. 742, 765 (1998).  The Court need not devote extensive analysis to Denver's argument on this point, as it is undisputed that Ms. Arabalo lodged complaints about inmate harassment and about having to work with the

30

two Deputies who raped her, as required by the Department's policies.  (It is further undisputed that those complaints were not investigated or acted upon.)  Thus, Ms. Arabalo did avail herself of the "corrective opportunities" offered by the Department with regard to these instances. Although Ms. Arabalo apparently did not ever timely report Mr. Gutierrez's harassment of her to her superiors, the parties have not addressed whether that failure alone can give rise to an *Ellerth*-type defense, nor how the application of such a defense would bear on Ms. Arabalo's ability to recover on the other components of her hostile environment claim.  The Court declines to speculate on how a complex question of this sort might ultimately be resolved.

Accordingly, Denver's motion for summary judgment on Ms. Arabalo's Title VII hostile environment claim is denied.

### 3.  Title VII claim – retaliation

To establish a claim for retaliation under Title VII, Ms. Arabalo must first demonstrate a *prima facie* case, showing: (i) that she engaged in conduct protected by Title VII; (ii) that she suffered an adverse employment action; and (iii) there is some causal connection between that protected conduct and the adverse action.  The burden then shifts to Denver to articulate a legitimate and non-retaliatory reason for the adverse action, and Ms. Arabalo bears the ultimate burden of proving that the proffered reason is untrue and a pretext for retaliation.  *Conroy v. Vilsack*, 707 F.3d 1163, 1181 (10th Cir. 2013); *Robert v. Board of County Commissioners*, 691 F.3d 1211, 1219 (10th Cir. 2012).

### a.  Protected conduct

Neither party addresses the first element of the *prima faice* case: the specific instances of protected conduct by Ms. Arabalo, but doing so is essential to analyzing the claim.  It is

31

undisputed that she filed a CCRD charge on October 19, 2010, and that charge was served on

Denver on or about November 1, 2010.  (Ms. Arabalo contends that she filed the CCRD charge

in April 2010.  Although the record contains a CCRD Intake Questionnaire that she completed

on or about that date, there is no indication that any charge resulted from that questionnaire until

October 19.)  Denver was first notified that she had filed an EEOC charge on or about July 1,

2010.  In addition, she contends that her complaints to her superiors about the inmates harassing

her constitute protected activity, but because the adverse actions discussed below occurred well

after she left the jail in June 2009, the Court need not consider those complaints.

b. <u>Adverse action</u>

Ms. Arabalo's response identifies three specific adverse actions she relies upon[17]: (i)

"initiating numerous internal affairs investigations" against her; (ii) suspending her employment;

and (iii) "releasing negative information to the media" about her.  Ms. Arabalo's response does

not describe these events with particularity, but it appears that they are somewhat interrelated.

On or about July 26, 2010, the Internal Affairs Bureau began an investigation of Ms. Arabalo for

alleged falsification of records, arising out of an incident in which Ms. Arabalo was accused of

---

[17]     Her response argues that "Defendants took various adverse employment actions against
her, including but not limited to" those set forth by the Court.  In a footnote, she states that her
"discovery responses set forth exhaustive explanations of various actions taken against [her],
including actions other than those identified in this response."  Ms. Arabalo seems to believe that
the Court should independently review the discovery responses (notwithstanding her admission
that there are likely adverse actions identified [there] that may not be material for purposes of
this motion"), assuring the Court that "there are plenty of adverse actions that are relevant and
material."
        The Court declines to consider any adverse action other than those specifically identified
and addressed by Ms. Arabalo's response.  Especially in an employment case such as this, it is
Ms. Arabalo's burden to "**specifically** reference facts in [her] motion materials and the record"
that support her contentions; the Court will not undertake to do so on her behalf.  *Adler v. Wal-
Mart Stores, Inc.*, 144 F.3d 664, 672 (10th Cir. 1998) (emphasis added).

falsely representing to her supervisor that she had timely reviewed and downloaded reports of jail employees conducting required "rounds" (that is, checking on the welfare of the inmates periodically), when, in fact, she had not logged onto the jail computer system to review or download the logs for several days.  That investigation concluded on January 31, 2011 with Ms. Arabalo receiving a 70-day disciplinary suspension.

At some point during the first quarter of 2011, the Denver's Office of the Independent Monitor issued a document entitled "Police and Sheriff Discipline and Critical Incident Report." A portion of that report lists those instances in which the Independent Monitor had "concerns regarding [the Department's] findings and discipline."  It recited with some specificity the circumstances of the falsification charge against Ms. Arabalo, the Department's conclusions, and the discipline imposed; however, it always referred to Ms. Arabalo only as "a Sheriff Captain" or "the Captain," never mentioning Ms. Arabalo by name.  The discussion concluded with the Monitor noting that and commented that "the Monitor believes that" the suspension imposed was inadequate discipline, and that "the Sheriff Captain should have been demoted from Captain to Deputy."  Although the Court has grave reservations as to whether a public report that does not personally identify Ms. Arabalo can be construed as an adverse action that "damaged her reputation," the Court will assume, without necessarily finding, that it is an adverse action for retaliation purposes.

A second Internal Affairs investigation began on May 23, 2011, looking into whether Ms. Arabalo misappropriated funds from the Foundation.  That investigation concluded on March 16, 2012 with Ms. Arabalo's termination.

c. <u>Causal connection</u>

Having defined the pertinent protected activities and adverse action, the Court turns to the question of whether Ms. Arabalo can show a causal connection between them.   Typically, that showing is made by demonstrating a close temporal proximity between the two events.   In *Conroy*, the 10th Circuit explained that a causal inference is permissible only if the protected conduct was followed very closely in time by the adverse action; a delay of up to one-and-a-half months is sufficient to permit an inference, but a delay of more than three months is not.   707 F.3d at 1181.   If the delay exceeded the permitted interval, the employee is obligated to come forward with additional evidence of causation.   *Id.*

Here, the record shows that Denver was first advised of Ms. Arabalo's EEOC charge on or about July 1, 2010, and that it initiated the investigation into her falsification of records on or about July 26, 2010.   Thus is sufficient, of itself, to establish the requisite causal connection. The Court will further assume that the imposition of the 70-day suspension on Ms. Arabalo followed naturally from the commencement of that investigation, and thus, the Court will deem her to have established a *prima facie* case of retaliation with regard to that action as well.

However, the Court finds that Ms. Arabalo has not demonstrated any temporal proximity or other causal connection between either of her charges of discrimination and the Independent Monitor's release of information about her case.[18]   Taking the latest possible date of protected activity – Denver's November 1, 2010 receipt of her CCRD charge – and assuming that the Independent Monitor's report was released at some point fairly early during the First Quarter of

---

[18]      Indeed, it is somewhat unclear to the Court how the Denver, acting as Ms. Arabalo's employer, has the ability to control the actions of the Independent Monitor, such that one could even say that the release of the report was an adverse action <u>taken by Denver</u>.

2011, the temporal interval between those events is at least two full months, and highly likely to be even longer. Pursuant to *Conroy,* Ms. Arabalo cannot simply rely on temporal proximity and must come forward with additional evidence suggesting a causal connection between the events. She has not done so.  By all appearances, the issuance of the Monitor's report was required by law. The Court takes judicial notice of Section 2-375 of the Denver Revised Municipal Code, which requires the Monitor's office to "submit an annual public report . . . setting forth the work of the monitor's office during the prior calendar year; . . . including, but without identifying specific persons, . . . making recommendations regarding the sufficiency of investigations and the appropriateness of disciplinary actions."

Far from being a gratuitous act by Denver, done to retaliate against Ms. Arabalo for complaining of discrimination, the issuance of the Monitor's report simply reflects an independent agency of the City and County of Denver performing the very task it is charged to do.  Indeed, the Court notes that the report is critical not only of Ms. Arabalo (in an anonymous way), but also of the Department's seemingly favorable treatment of her.  Given the criticism in the report directed at the Department itself, it would be extremely strange to conclude that Denver chose this particular vehicle to retaliate against Ms. Arabalo.  Accordingly, the Court finds that Ms. Arabalo cannot establish a *prima facie* claim of retaliation arising from the issuance of the Monitor's report.

The question of whether the commencement of the May 2011 investigation into Ms. Arabalo is causally-connected to her protected activities of filing the CCRD charge in or about November 2010 is more difficult.  Facially, the two events are separated by a period of approximately six months, suggesting that no inference of causation can be drawn from temporal

proximity, alone.  However, Ms. Arabalo has alleged (and the Defendants essentially concede) that this investigation grew out of the accusation against Ms. Arabalo made by Mr. Gutierrez during an Internal Affairs interview with him concerning Ms. Arabalo's complaints of sex discrimination.  That interview occurred on or about January 13, 2011, approximately two and a half months after Ms. Arabalo's CCRD charge.  Between the somewhat attenuated temporal proximity and the clear connection between Ms. Arabalo's charge of discrimination and Mr. Gutierrez's leveling the allegations against her that subsequently prompted the investigation, the Court is satisfied that Ms. Arabalo has demonstrated a *prima facie* case of retaliation regarding the commencement of the May 2011 investigation.

### d.  Exhaustion

Having limited Ms. Arabalo's retaliation claim to the two instances of the Department commencing investigations into her conduct, the Court pauses at this stage to address another issue raised by Denver: that Ms. Arabalo's retaliation claims are barred because she failed to exhaust her remedies with the EEOC prior to bringing suit.  In the 10th Circuit, it is a jurisdictional prerequisite to a suit under Title VII for the employee to have exhausted her administrative remedies.[19]  *See Logsdon v. Turbines, Inc.*, 399 Fed.Appx. 376, 378-79  (10th Cir. 2010) (unpublished).   Under Title VII, a lawsuit may be brought only after the employee has presented the substance of the claim in a charge filed with the EEOC or CCRD and has obtained

---

[19]     The 10th Circuit has repeatedly acknowledged that this holding represents the minority view, and indeed, the court itself has expressed doubts as to its continuing validity. *Id.* at n. 2; *Jones v. Runyon*, 91 F.3d 1398, 1399 (10th Cir. 1996).  Nevertheless, it continues to adhere to that position. *Id.*

   Ultimately, because Denver has properly raised the matter as an affirmative defense in its summary judgment motion, the question of the proper legal treatment of it is largely irrelevant. *Logsdon*, *id.* at n. 1.  In an abundance of caution, this Court will treat Denver as bearing the burden of proving that Ms. Arabalo failed to exhaust her administrative remedies.

a notice of right to sue.  42 U.S.C. § 2000e-5(f)(1) ("If a charge filed with the Commission  . . . is dismissed by the Commission, [it] shall so notify the person aggrieved and within ninety days after the giving of such notice a civil action may be brought against the respondent named in the charge").  Every discrete incident of discriminatory or retaliatory treatment constitutes a separate unlawful practice, and thus, must be administratively exhausted.  *Logsdon*, 399 Fed.Appx. at 378.

Here, Ms. Arabalo's CCRD charge expressly asserts that "On or about July 2010, I was brought under investigation for . . . not checking rounds reports."  The CCRD charge expressly notes asserts that Denver's conduct constituted, among other things, retaliation.  Thus, the Court finds that Ms. Arabalo adequately exhausted her retaliation claim regarding the July 2010 investigation.

The same cannot be said of the May 2011 investigation into her alleged embezzlement.  As noted above, that issue first came to the Department's attention in January 2011, after Ms. Arabalo had filed the last EEOC or CCRD charge in the case.  Necessarily, then, those charges could not recite an allegation that the May 2011 investigation was itself retaliatory, and indeed, a review of the charges in the record confirms that conclusion.  Ms. Arabalo does not allege that she filed additional charges of discrimination with the EEOC or CCRD after May 2011, nor indicate that she ever formally supplemented the charges she had filed to include mention of the May 2011 investigation.

In determining whether an employee has exhausted her administrative remedies, the Court considers "the scope of the administrative investigation that can reasonably be expected to follow from the discriminatory acts alleged in the administrative charge[;] in other words, the

37

charge must contain facts concerning the discriminatory and retaliatory actions underlying each claim." *Logsdon*, 399 Fed.Appx. at 379 (emphasis in original), *citing Jones v. United Parcel Serv.*, 502 F.3d 1176, 1186 (10th Cir. 2007).

*Jones* appears to suggest a nearly-categorical rule that discrete adverse actions occurring after a charge is filed will necessarily not fall within the scope of that charge. *Id.* ("any adverse employment actions occurring after Mr. Jones submitted his administrative charge on February 27, 2004, would not fall within the scope of his charge"); *accord Logsdon*, 399 Fed.Appx. at 379 (employee discharged on the day after she filed EEOC charge challenging disciplinary matters and failure to promote deemed not to have exhausted claims of discriminatory or retaliatory termination as a discrete adverse action, even though discharge was mentioned by employer in its response to the EEOC about the charge; "Because the termination claims were omitted from the Charge, it would not be reasonable to expect the EEOC to investigate those claims based on the discussion of her discharge in Turbines' position statement").

Here, Ms. Arabalo's CCRD charge makes no mention whatsoever of the commencement of an investigation into allegations of alleged embezzlement, and thus, the EEOC's investigation into the issues raised in her charge would not have encompassed that issue.

Ms. Arabalo's response to this portion of Denver's motion offers no particular argument in opposition. In the section of her brief entitled "Exhaustion of Administrative Remedies – Title VII Retaliation," she simply refers back to the brief's previous section, addressing the exhaustion of her remedies with regard to her hostile environment claims. Almost all of that discussion is simply inapposite to the issue of whether she exhausted her administrative remedies with regard to her retaliation claims. At best, it mentions – without actually citing authority for – the

"continuing violation doctrine."  Before being severely limited by the Supreme Court, that

doctrine allowed employees to bring suit under Title VII based on events that occurred prior to

the 300-day period within which an employee was required to file an EEOC charge; so long as

the time-barred acts were part of "an ongoing unlawful employment practice" (or "continuing

violation"), the untimely acts could be actionable.  *See National R.R. Passenger Corp. v.

Morgan*, 536 U.S. 101, 106-07 (2002).  For this reason alone, the invocation of the "continuing

violation" doctrine is irrelevant, as the question presented is not whether Ms. Arabalo can assert

in an EEOC charge events occurring more than 300-days prior to that charge, but rather, whether

she is relieved from the obligation of having to even mention the acts upon which her retaliation

claim is based in her EEOC charge.  Moreover, even if the "continuing violation" doctrine was

germane to the issue presented here, *Morgan* abrogated that doctrine with regard to "discrete"

employment actions, requiring that charges attacking those actions be filed within the 300-day

period.[20]  *Id.* at 113-116.  Because the commencement of an investigation into alleged

misconduct is a discrete act whose happening can be identified as occurring on a particular day –

Denver points to a file memorandum that establishes the commencement of the May 2011

investigation – it is not subject to the "continuing violation" doctrine in any event.

Accordingly, the Court finds that Ms. Arabalo did not administratively exhaust any

retaliation claim predicated on the May 2011 investigation into allegations that she embezzled

funds from the Foundation, and thus, Denver is entitled to summary judgment on any retaliation

claim predicated on that investigation.

---

[20]      *Morgan* permitted more ephemeral hostile environment claims (ongoing "practices,"
rather than "discrete events") to continue to apply the "continuing violation" doctrine.

e.  Pretext

Having reduced Ms. Arabalo's cognizable retaliation claim to the single instance of the July 2010 investigation into her failure to make rounds, the Court turns to Denver to articulate a legitimate, non-retaliatory reason for commencing that investigation against her.  Denver has pointed to its letter to Ms. Arabalo reciting the findings of the investigation, which indicates that the investigation was prompted on July 23, 2010 by "Major Homer submit[ting] a memo to Major Brown requesting the Internal Affairs Bureau open a case alleged you departed from the truth by falsifying a report."  It notes that this occurred after Major Homer received a July 15, 2010 e-mail from Ms. Arabalo reporting that the rounds data had been downloaded through July 14, but Major Homer opened the database on July 15 and found that it contained no data for July 14.  Major Homer then sought an Internet History Report for Ms. Arabalo that revealed that she did not log on to the database until July 21.  These facts thus demonstrate a legitimate, non-retaliatory reason for commencing an investigation into Ms. Arabalo.

To demonstrate that this proffered explanation is a pretext for retaliation, Ms. Arabalo must show that the explanation is "so incoherent, weak, inconsistent, or contradictory that a rational factfinder could conclude [it to be] unworthy of belief."  *Conroy*, 707 F.3d at 1172.  Ms. Arabalo's response on this point is quite general.  She argues that Denver "failed to submit appropriate factual support" for its explanation (although acknowledging that Denver has submitted a lengthy termination letter setting forth its investigation and findings in detail), that "she had been complaining about discrimination for several years" at that point and that Denver "wanted to get rid of the complaining troublemaker," and that she had "a pristine work history and a reputation for preparing accurate and timely reports."  (She also alleges in a different part

of her brief that she had never been trained on how to use the rounds tracking database.)  None of these contentions, however, refute the facts underlying Denver's proffered explanation: that she submitted an e-mail claiming to have done something that she did not, in fact, do.  Ms. Arabalo does not point to evidence that other similarly-situated employees who had falsely (or, perhaps in Ms. Arabalo's view, incorrectly) claimed to have uploaded work data were not investigated, does not contend that Major Homer's allegations were demonstrably false (*i.e.* that the rounds data had been uploaded promptly), nor has she pointed to evidence that would suggest that the decision to investigate a supervisory employee with law enforcement responsibilities that appears to have falsely claimed to have ensured that rounds were being performed is a particularly implausible one.[21]

Under these circumstances, Ms. Arabalo has not pointed to any evidence from which a factfinder could conclude that Denver's explanation for its decision to commence an investigation into her failure to report the rounds data was a pretext for retaliation.  Denver is therefore entitled to summary judgment on her Title VII retaliation claim in its entirety.

---

[21]    In reality, Ms. Arabalo's argument is not so much that the Department should not have begun <u>investigating</u> her for the incorrect reporting, but that it should not have imposed such a lengthy suspension against her once it found her to have engaged in incorrect reporting.  The decision letter supplied by Denver indicates that the length of the suspension was based on the findings that "you disobeyed a direct order, you departed from the truth, you falsified a record, and you failed to perform the required duties of your position," all of which constitute separately severe infractions.  Moreover, as noted in the Independent Monitor's report, the issue of employees making adequate rounds was particularly significant at the time because of a "recent high-profile in-custody death where it was determined that Sheriff's Deputies were not conducting rounds as required by policy and procedure," and that death had resulted in an "enormous payout made by the City" in ensuing litigation.   This, perhaps, explains why the Monitor believed that a 70-day suspension was actually <u>too lenient</u> for Ms. Arabalo's conduct.

### 4.  § 1983 claim against Mr. Deeds

Ms. Arabalo's third claim is brought pursuant to § 1983 against Mr. Deeds.  As described in the Third Amended Complaint, this claim alleges that, after Ms. Arabalo reported having been raped by the two Deputies to Mr. Deeds, he failed to report that matter to City officials or commence a formal investigation.  This, she contends, deprived her of her Fourteenth Amendment right to equal protection.  Ms. Arabalo appears to allege that Mr. Deeds is both personally liable for failing to undertake these acts on his own, as well as in an official capacity in that he "fail[ed] to train" and "fail[ed] to supervise" others, a contention that appears to be based on Mr. Deeds' failure to train the two Deputies in the Department's sexual harassment policy.

The parties' briefing on this claim is somewhat unclear as to the precise contours od Ms. Arabalo's claim.  The Court will do its best to unpack the claim.  With regard to the claim that Mr. Deeds is subject to liability in his official capacity for failing to adequately train or supervise, Ms. Arabalo's response explains that he "did not train [the Deputies], or any of his subordinates regarding the Department's anti-discrimination or harassment policies."  Although this is an accurate recitation of Mr. Deeds' deposition testimony, it has no particular connection to Ms. Arabalo's claimed injuries.  To the extent she is attempting to suggest that Mr. Deeds' failure to train or to supervise the two Deputies in the Department's anti-harassment or anti-discrimination policies caused the rape to occur, Ms. Arabalo fails to account for the fact that the rapes occurred when all parties involved were off-duty and off-premises.  Nothing in the record suggests that, when socializing in Ms. Arabalo's basement and enjoying alcoholic drinks, Ms. Arabalo or the Deputies were acting under color of state law or exercising any of their authority

42

as law enforcement officers.  *C.f. David v. City and County of Denver*, 101 F.3d 1344, 1352-54 (10th Cir. 1996).  Because the circumstances leading to the rape were utterly unconnected with any employment status of any of the persons involved, Mr. Deeds' failure to train or supervise the Deputies in their capacity as Department employees is not causally-connected to the rape and exposes Mr. Deeds to no official capacity liability for that event.  *See e.g. Priller v. Town of Smyrna*, 430 F.Supp.2d 371, 377-78 (D.Del. 2006).

Moreover, to the extent that Ms. Arabalo contends that Mr. Deeds' failure to train or supervise employees <u>other</u> than the two Deputies in anti-discrimination or anti-harassment policies caused her injuries here, she has failed to articulate a factual scenario illustrating that proposition.  She does not allege, for example, that Mr. Deeds was responsible for training or supervising Mr. Gutierrez.  Accordingly, Mr. Deeds is entitled to summary judgment on Ms. Arabalo's § 1983 claim against him in an official capacity.

To the extent Ms. Arabalo asserts a § 1983 claim against Mr. Deeds based on his own actions in depriving her of equal protection, that claim appears to be predicated on Mr. Deeds' failure to pass along her report of having been raped by the Deputies to other authorities or his failure to commence an investigation into the matter.  Ms. Arabalo offers no explanation as to how such conduct constitutes a deprivation of her right to equal protection.  The crux of that right is that the government is required to treat similarly-situated persons similarly, or to articulate a sufficient reason for affording unequal treatment.  *Engquist v. Oregon Dept. of Agr.*, 553 U.S. 591, 601 (2008);  *Taylor v. Roswell Indep. School Dist.*, 713 F.3d 25, 53-54 (10th Cir. 2013); *Brown v. Montoya*, 662 F.3d 1152, 1172-73 (10th Cir. 2011).  Thus, to state a claim under § 1983 premised on equal protection, Ms. Arabalo must first identify similarly-situated others

who were treated more favorably than she was.[22]  *Taylor*, 713 F.3d at 53; *Brown*, 662 F.3d at 1173.  .

Ms. Arabalo is thus required to show that Mr. Deeds <u>did</u> choose to investigate (or to report to higher authorities) allegations that other employees had been victims of an off-duty rape.  Needless to say, Ms. Arabalo does not identify any other person who reported the same, or even remotely similar, conduct to Mr. Deeds, much less that Mr. Deeds processed such a report differently than he did with her complaint.  Instead, she offers a broader assertion, unsupported by citation to the record, that "Deeds' failure to investigate and report the rape was representative of the Department's overall custom and practice of failing to investigate complaints or sexual harassment or discrimination and/or its widespread practice of ignoring such complaints."  Assuming that Ms. Arabalo is contending that Mr. Deeds manifested such disregard for complaints of sexual harassment or discrimination only from female employees, an equal protection claim might lie if Ms. Arabalo produced sufficient supporting evidence.  But she does not offer any facts regarding Mr. Deeds' conduct towards any other female employees (or, for that matter, any male employees) complaining of harassment or discrimination other than herself.  Thus, she has failed to demonstrate the fundamental cornerstone of an equal protection claim – the differential treatment of persons who are otherwise similarly-situated.

At a more fundamental level, the Court sympathizes with Ms. Arabalo.  Taking the facts in the light most favorable to her, Mr. Deeds' failure to take any action when informed that one

---

[22]    Equal protection claims can also be predicated on "class of one" assertions – that is, that "a public official, with no conceivable basis for his action other than spite or some improper motive . . . comes down hard on a hapless private citizen."  *Kansas Penn Gaming, LLC v. Collins,* 656 F.3d 1210, 1216 (10th Cir. 2011).  However, the Supreme Court has held that the "class of one" analysis is inapplicable to cases involving public employment.  *Enquist*, 553 U.S. at 603.

of his employees had been raped by two other employees is a craven and selfish act, particularly for a person whose job it is to enforce the law.  (At the same time, it is not clear whether or when Ms. Arabalo herself elected to report the incident to appropriate police authorities.)  The Court is also cognizant of evidence that Mr. Deeds subsequently informed Ms. Arabalo that, if questioned by the Internal Affairs Bureau about whether she reported the incident to him, he would lie and say she hadn't.  It is thus fortunate that Mr. Deeds was eventually forced to resign his position with the Department. Nevertheless, such conduct, as reprehensible as it was, does not, without more, amount to an equal protection violation.  Accordingly, Mr. Deeds is entitled to summary judgment on Ms. Arabalo's claims against him.

### 5.  § 1983 claim against Ms. Kilroy

Ms. Arabalo's next claim is brought pursuant to § 1983 and directed at Ms. Kilroy, solely in her official capacity.  This is essentially a claim against Denver itself, and thus, the Court will refer to it as such. *Kentucky v. Graham*, 473 U.S. 159, 166 (1985).   The Third Amended Complaint alleges that Denver deprived Ms. Arabalo of equal protection due to a variety of conduct, including failure to train its employees to identify and report workplace discrimination, failure to investigate complaints of discrimination, and failure to adopt and implement effective anti-discrimination policies, among other things.  The Complaint's articulation of this claim also alleges that Ms. Kilroy's decision to terminate Ms. Arabalo as retaliation for her complaints of discrimination violated her right to equal protection.

The claim described in Ms. Arabalo's summary judgment response emphasizes only this last contention.  Ms. Arabalo contends that Denver "deliberately chose to impose inconsistent and unfair discipline with respect to the disciplinary matters in this case," such that she was

exposed to more harsh treatment than either Mr. Deeds or Mr. Gutierrez.  The Court thus limits its analysis of this claim to that issue.

Once again, because Ms. Arabalo is contending that she was deprived of her right to equal protection, she is obligated to demonstrate that she received worse treatment than other similarly-situated individuals.  *Taylor*, 713 F.3d at 53.  For purposes of an equal protection analysis, persons are "similarly-situated" when they are "in all relevant respects alike."  *Id.*  In the employment context, employees are generally considered "similarly-situated" when they deal with the same supervisor and are subject to the same standards governing performance, evaluation, and discipline, and have violated work rules of comparable seriousness.  *Vigil v. South Valley Academy*, 247 Fed.Apxx. 982, 991 (10th Cir. 2007) (unpublished), *citing Aramburu v. Boeing Co.*, 112 F.3d 1398, 1404 (10th Cir. 1997).

Thus, it is first necessary to identify the individuals being compared and the misconduct they engaged in.  Ms. Arabalo, as discussed at length herein, was suspended for 70 days for making false statements about having made rounds, and was ultimately termination for mishandling funds entrusted to her through the Foundation.  She compares herself to Mr. Deeds, who was told he would be terminated (apparently for having stated to Ms. Arabalo that he would lie about what she told him about the rape if interviewed by the Internal Affairs Bureau), but was permitted to resign in lieu of termination, and to Mr. Gutierrez, who was issued a 30-day suspension for having engaged in sexually harassing behavior.[23]

---

[23]     Ms. Kilroy testified in her deposition that she found that Mr. Gutierrez had engaged in conduct "which was observed by a third party as offensive," but did not conclude that Mr. Gutierrez's conduct towards Ms. Arablo was "unwelcome" by Ms. Arabalo.  Ms. Kilroy considered such misconduct of lesser severity than typical sexual harassment.

The Court finds that Ms. Arabalo and Mr. Deeds are, at least roughly, similarly-situated, particularly with regard to Ms. Arabalo's discipline for making false statements about completing rounds.  Both were found to have engaged in misconduct taking the form of untruthfulness on matters relating to their official duties.  However, the record reflects that, if anything, Ms. Arabalo received _more favorable_ treatment than Mr. Deeds in this regard: she was issued only a 70-day suspension, whereas Mr. Deeds was to be terminated.  Thus, to the extent that Denver treated Ms. Arabalo and Mr. Deeds unequally, it did so to Ms. Arabalo's _benefit_. Ms. Arabalo seems to focus her contentions with regard to Mr. Deeds on the fact that he was permitted to resign in lieu of termination, whereas she was not, but the record reflects that Denver did not present Mr. Deeds with any specific option to choose between resignation and termination; Ms. Kilroy testified that "he wasn't given an opportunity to resign.  We were terminating him and he chose to resign prior to being terminated."  Thus, to the extent Mr. Deeds and Ms. Arabalo engaged in similar misconduct, Ms. Arabalo has not shown that Mr. Deeds was treated more favorably than she was.

As to Mr. Gutierrez, the Court cannot conclude that his having engaged in sexual harassment is misconduct that is comparable to Ms. Arabalo's misconduct of making false statements and mishandling funds.  Although both offenses are undoubtedly serious and warrant punishment, the Court cannot say that they are of the same qualitative character, such that one would expect that the discipline imposed for each would be similar.  Making false statements and embezzling funds are matters that go to the heart of a law enforcement officials' job duties, as truthfulness is a necessary trait for such employees.  Without intending to diminish the seriousness of workplace sexual harassment, such conduct, despite being unprofessional, does

not implicate concerns of truthfulness and responsibility.  Thus, it is entirely understandable that Denver would choose to punish misconduct bearing on an employee's truthfulness more severely than it would punish sexual harassment.  Consequently, the Court cannot say that Mr. Gutierrez is similarly-situated to Ms. Arabalo for purposes of her equal protection claim.

Because the Court does not understand Ms. Arabalo's summary judgment response to describe the official capacity claim against Ms. Kilroy as encompassing anything more than the issues described above, the Court finds that Denver (and Ms. Kilroy) is entitled to summary judgment on that claim.

### 6.  Breach of contract

Ms. Arabalo's final claim invokes Colorado law.  Although employment in Colorado is generally at-will, Colorado courts will deem termination procedures set forth in employee handbooks or policy manuals as having contractual effect where one of two circumstances is present: (i) under a contract theory – that is, in promulgating the procedure, the employer was manifesting a willingness to be contractually-bound (*e.g.* making an offer) by the terms of that policy, and the employee's acceptance of employment could be deemed to be an acceptance of that offer (with the employee's performance of services serving as consideration); or (ii) under a promissory estoppel theory, if the employee shows that the "employer should reasonably have expected the employee to consider the employee manual as a commitment from the employer to follow the termination procedures," and that the employee relied upon that representation to her detriment.  *Continental Airlines, Inc. v. Keenan*, 731 P.2d 708, 711-12 (Colo. 1987).  It is essential, however, that the employer's statement "disclose a promissory intent" or be such that an employee could reasonably construe it as a "commitment by the employer"; a "mere

48

description of the employer's present policies" does not give rise to an enforceable agreement. *Soderlun v. Public Serv. Co. of Colo.*, 944 P.2d 616, 620 (Colo.App. 1997).

The precise contours of Ms. Arabalo's breach of contract claim is somewhat unclear. She states that "her claim is based on the City/Department's employment manual, discipline handbook, EEOC policies, and other relevant policies and procedures," including "Departmental Orders issued by the Department and the Department's Discipline Handbook." The only evidentiary material she points to in conjunction with this assertion is: (i) the Denver Sheriff Department Discipline Handbook; and (ii) three Department Orders, one setting forth the Department's Sexual Harassment policy, one addressing Equal Employment Opportunity, and one entitled "Human Relations/Code of Ethics and Standard of Conduct." Notably, with regard to the Handbook, Ms. Arabalo's summary judgment response does not identify or quote any specific policy within that 116-page document; at best, she states only that the Handbook "contain[s] strong language regarding what supervisors shall and shall not do and how discipline shall be imposed for various types of misconduct." Nor does she offer any specific explanation as to how these policies were allegedly breached in her case; she merely states that "the Department and the City failed to live up to its policies and procedures in several ways, which are described herein," apparently meaning described generally in her summary judgment response with regard to other claims.

The Court declines to take upon itself the task of fashioning a colorable breach of contract claim for Ms. Arabalo out of the lengthy Handbook. As previously noted, the burden on a summary judgment respondent is to "specifically reference facts in its motion materials and in the record," not merely to suggest general theories or make broad factual assertions and expect

that the Court will "uncover [the specific supporting evidence] itself." *Adler*, 144 F.3d at 671-72. Citation to a 116-page employee handbook, without any specific indication of the particular policy contained therein that is being invoked, is simply insufficient to comply with the requirements imposed on Ms. Arabalo. Accordingly, the Court refuses to canvass the Handbook on Ms. Arabalo's behalf, and thus, declines to consider the Handbook in determining whether Ms. Arabalo's breach of contract claim may proceed.[24]

The Court is thus left with Ms. Arabalo's contention that the Department Orders constituted a contractual offer or promise. As with the Handbook, Ms. Arabalo does not identify which of the three policy documents she relies upon, much less points the Court to the specific portion of a policy that she contends the Department violated, and for the same reasons discussed above, the Court declines to *sua sponte* examine the full 12 pages of that exhibit as well. Assuming it did, the Court would further note that Ms. Arabalo <u>herself</u> was never disciplined

---

[24]     Were the Court to attempt to delve into the Handbook, it would stop on the very first page, which contains the following disclaimer:

> The purpose of this Discipline Handbook . . . is to provide [employees] with notice of the principles and guidelines which shall be employed by the Department in making disciplinary decisions. This Handbook should be reviewed and considered in conjunction with revisions to Department Rules and Regulations, all other Department policies and procedures related to discipline, and the rules of the Career Service Authority. **This Handbook is not intended to establish any** appellate or **other legal rights** not granted by the Career Services Authority. (Emphasis added.)

The bolded language (not to mention the characterization of the contents of the manual as being "principles and guidelines," rather than requirements or obligations, and reference to the Department's right to engage in "revisions to Department Rules and Regulations") constitutes the type of "clear and conspicuous disclaimer" of any contractual effect that is sufficient to defeat any breach of contract claim. *See Jaynes v. Centura Health Corp.*, 148 P.2d 241, 248 (Colo.App. 2006).

under any of these policies; rather, it appears that Ms. Arabalo's breach of contract claim is premised upon the fact that the Department did not follow its policies in investigating her complaints of harassment and in imposing discipline on <u>others</u>.  The implied contract doctrine described in *Keenan* is explained as being an exception to the general rule of at-will employment, and thus, has, to the best of this Court's knowledge, only been applied to employer policies governing <u>termination</u>.  *See e.g. Keenan*, 731 P.2d at 711.  Ms. Arabalo's claim appears to contend that the Court can give contractual effect to any statement of employer policy on <u>any</u> subject, conferring upon the employee the right to sue in contract to vindicate, for example, an employer's promise not to discriminate, or even, arguably, an employer's failure to comply with policies governing such prosaic matters as coffee breaks and office assignments.  This Court's review of Colorado law has revealed no case in which courts have recognized the applicability of the doctrine to employer policies other than those governing termination or discipline,[25] and thus, the Court declines to construe Colorado law to permit Ms. Arabalo to bring a breach of contract claim over the Department's alleged failure to, for example, properly investigate and process her claims of sexual harassment.

In any event, the Court sees nothing in the cited policies that could be construed as a contractual offer or actionable promise.  The Department Orders are nothing more than typical statements of employer policy.  Ms. Arabalo points to no particular representations that were made to her about the policies, much less any promise that the policies would be universally

---

[25]      Arguably, Ms. Arabalo is contending that the Department was obligated to honor the representations in the sexual harassment policy that harassers would be appropriately disciplined. In other words, she argues that the Department breached its contract with <u>her</u> by not disciplining <u>Mr. Gutierrez</u>.  The Court is aware of no Colorado authority extending the doctrine of implied contract to a situation in which an employee alleges a contractual breach because the employer did not discipline a third party.

observed.  Although the policies contain "mandatory" language, in the sense that "any employee . . . is required" to report sexual harassment to a supervisor or that the Department "will not discriminate against an employee," cannot reasonably be construed as a specific promise or guarantee to employees; rather, it is clearly just a statement of expectations or general principles that the Department will strive to observe.  Thus, Ms. Arabalo has not shown sufficient evidence to establish the existence of an enforceable promise by Denver sufficient to support her breach of contract claim.

## CONCLUSION

For the foregoing reasons, Ms. Arabalo's Objections (**# 129**) are **OVERRULED**, and the Court **ADOPTS** the Magistrate Judge's March 1, 2013 Recommendation (**# 127**). Mr. Guiterrez's Motion to Dismiss (**# 112**) is **GRANTED** and Ms. Arabalo's claims against Mr. Gutierrez as **DISMISSED**.   Defendants City and County of Denver ("Denver"), Ms. Kilroy, and Mr. Deeds' Motion for Summary Judgment (**# 128**) is **GRANTED IN PART**, insofar as these Defendants are entitled to summary judgment on all of Ms. Arabalo's claims with the exception of her Title VII claim against Denver, sounding in hostile environment sexual harassment, and the motion is **DENIED IN PART** with regard to that claim, which will proceed to trial.  The parties shall begin the preparation of a Proposed Pretrial Order with regard to that claim as set forth in Docket # 34, and shall jointly contact chambers to schedule a Pretrial Conference.

Dated this 26th day of August, 2013.

**BY THE COURT:**

Marcia S. Krieger
_____

Marcia S. Krieger
Chief United States District Judge